IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MAURICE DICKENS | : |
|    Petitioner | : |
| v. | :   Civil Action No. AMD-05-1552 |
| JAMES V. PEGUESE | : |
|    Respondent | : |

..o0o..

MEMORANDUM

In response to this court's order of June 29, 2005, respondent has filed an answer to the petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Paper No. 6. Petitioner has filed a traverse and an amended traverse to the answer.[1] Papers No. 9 and 14. Upon assurance by counsel for respondent that petitioner has been served with copies of all exhibits filed with the answer,[2] the matter is now ripe for this court's consideration. Papers No. 10 and 11. This court has reviewed the papers filed and finds an evidentiary hearing is unnecessary. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6*; see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner is not necessarily entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons that follow, the petition will be denied.

Background

On September 13, 2000, petitioner was convicted of attempted first degree murder, attempted second degree murder, first degree assault,[3] and use of a handgun in the commission of a crime of

---

[1] Recent correspondence from petitioner indicates his concern that his traverse was not received. Petitioner is assured that both traverses have been filed, read and considered by this court.

[2] *See Thompson v. Greene*, 427 F.3d 263 (4th Cir. 2005), requiring service of exhibits in a habeas corpus proceeding involving a *pro se* petitioner.

[3] The assault conviction merged with the attempted murder convictions.

violence after a jury trial in the Circuit Court for Baltimore County. Paper No. 6 at Ex. 7. Petitioner was sentenced to life in prison for attempted murder and 20 years consecutive to the life sentence for use of a handgun in the commission of a crime of violence. *Id*. at 1.

The victim in this case, Arnold Jackson, Jr., was shot in the chest, resulting in paralysis. He testified that on June 3, 1999, at approximately 11:00 p.m., he went to the Corinthian Lounge with several friends for karaoke night. *See* Paper No. 6 at Ex. 3, pp. 31-87. Upon exiting the bar after midnight, Jackson observed a man drive a green Lexus onto the parking lot, almost hitting one of his friends. A verbal confrontation resulted and the driver got out of the car during the argument. Shortly after it started, the first argument dissipated. Jackson testified that he got into a truck for a short period of time, but left to join his friend, who was talking to a girl in the parking lot. While the two men were talking to the girl, the driver of same green Lexus involved in the earlier incident almost hit Jackson, who exchanged words with the driver. Jackson testified that, in order to diffuse the situation, he apologized to the driver who then drove his car to the back of the building.

Jackson recalled that moments later, the same man who was driving the green Lexus "popped over the car" and shot him in the chest. The wound knocked Jackson to the ground. His assailant stood over him, pointing the gun at his head while Jackson begged for his life. When asked if the driver of the green Lexus could be identified, Jackson identified petitioner as the driver and as the man who shot him. In addition to his in-court identification, Jackson identified petitioner as the shooter from a photo array approximately one month after the shooting while he was still confined to a hospital.

Detective Mark Watkins, the investigating officer who showed petitioner the photographic array, testified that Jackson took only moments after seeing the photographs to identify petitioner as the man who shot him. *See id*. at Ex. 4, pp. 2– 70. He testified that the parking lot where the

incident occurred was well lighted on the night of the shooting. Watkins, testified that after interviewing witnesses to the incident, he obtained an arrest warrant for petitioner. The case generated some publicity and was covered by the media; ultimately, petitioner turned himself in to the police.

Malkia Waters, an eyewitness to the shooting, testified that on the night of the incident she had agreed to meet petitioner at the Corinthian Lounge.[4] *See id*. at Ex. 3, pp. 106-135. She testified that upon her arrival at the bar, petitioner and his cousin, Larry Sydnor, went into the related package goods store to purchase alcohol. Waters remained in the parking lot talking to others. She said that when she heard shots being fired she went to the ground to protect herself, but looked up in time to see the shooter standing over Jackson attempting to fire the gun at his head. Waters said the person she saw standing over Jackson with the gun was petitioner. She also observed that prior to shooting Jackson, petitioner removed his hat and a black shirt he had worn over a white t-shirt.

Toma Johnson, the man who was almost hit by the green Lexus and was involved in the initial confrontation, also testified for the prosecution. *See id*. at Ex 3, pp.87-103. He identified petitioner as the driver of the car and testified that after hearing the gunshots he observed a man dressed similar to the driver running from the scene.

One witness, Larry Sydnor, a/k/a Poopie, was called on behalf of the defense.[5] *See id*. at Ex. 4, pp. 79-125. Sydnor testified that he was following petitioner's car to the Corinthian Lounge, but stopped in the parking lot after someone stepped out in front of petitioner's car. He testified that he got out of his car to confront the person who stepped in front of petitioner's car, but that petitioner remained inside his car during the ensuing argument. He claimed he and petitioner were told they

---

[4]The two met at a gas station previously that night and agreed to meet later.

[5]Sydnor is petitioner's cousin.

3

could not drive into the area of the parking lot where they were headed because people were partying there. After returning to his car, Sydnor testified that someone again stepped in front of petitioner's car and again he (Sydnor) got out of the car to confront them. He maintained that petitioner never left his car during either altercation. Sydnor explained that the fight abated when he noticed some of his friends standing in another area.

Sydnor testified that petitioner then left in his car while Sydnor went into the package goods store. Upon exiting the store, Sydnor noted that petitioner was not there. He testified that he heard gun shots and left shortly thereafter.

Defense counsel asked Sydnor if he was told by police that he was a suspect in the case. Sydnor confirmed that he was told he was going to be charged with the crime. Counsel then asked Sydnor if he had in fact done the shooting. Sydnor invoked his Fifth Amendment privilege and declined to respond to the question.

Prior to closing arguments, the jury submitted a series of questions about the evidence in the case. The first question concerned whether pictures of the cars driven by petitioner and Sydnor were entered into evidence, when the photographs were taken, and if there were other pictures taken showing the cars on the night of the crime. Paper No. 6 at Ex. 4, p. 157. Upon receipt of the note, the judge informed counsel of its content and suggested the response should be that the jury should only consider the evidence submitted and that they could not speculate on evidence that was not presented. *Id*. at p. 158. Without objection from either side, the suggested response was provided. *Id*. at 158-59. The jury was excused for a recess prior to closing arguments. Upon their return to the courtroom, the jury presented the court with additional questions including: (1) whether Sydnor saw anyone running away from the scene when he exited the package goods store; (2) whether there were fingerprints on the shell casings; (3) whether defendant was known to own or possess a gun;

and (4) whether a juror may provide input about "characteristics" of the Corinthian where the juror had driven by the bar and knew the area well. *Id*. at 163. A lengthy discussion at the bench regarding the appropriate response to the questions followed. *Id*. at 163-178. Defense counsel objected to any response that did not include a reference to the jury's ability to consider the absence of evidence in addition to the evidence presented. The state countered with the position that inferences to be drawn from the evidence presented was a matter for argument, not instruction from the court. The response provided was as follows:

> You have heard all of the evidence on which you will and should base your verdict in this case. No additional evidence will be presented to you. You must base your verdict in this case on the evidence presented to you, and any inferences that can be drawn from that evidence. The inferences can be either positive inferences or negative inferences.

*Id*. at 179. Defense counsel excepted to the court's failure to instruct the jury that they could consider a lack of evidence and could base its decision as much on the lack of evidence as it could on the presentation of evidence. *Id*. No further questions were sent in by the jury. After returning a guilty verdict, the court proceeded directly to sentencing.

On appeal, petitioner raised four issues: (1) whether the circuit court erred in using two-part questions in its voir dire of the jury; (2) whether the circuit court abused its discretion by striking evidence of an alternative suspect; (3) whether the circuit court erred in declining to issue a missing witness instruction; and (4) whether the circuit court abused its discretion when it responded to the jury's questions prior to the conclusion of the case. *Id*. at Ex. 5, p. 2. On August 13, 2001, the Court of Special Appeals issued an unreported decision affirming petitioner's convictions. *Id*. at Ex. 7. In its decision, the court found that the issue regarding voir dire was not properly preserved for appeal because counsel did not object to the questions posed to the jurors. *Id*. at p. 6. It found no

merit in the remaining three issues. On November 13, 2001, the Court of Appeals denied petitioner's request for further review. *Id*. at Ex. 8-9.

On August 29, 2002, a petition for post-conviction relief was filed raising the following issues: (1) whether the prosecution withheld exculpatory evidence; and (2) whether trial counsel was ineffective for (a) failing to object to the two-part voir dire questions posed by the trial court, (b) failing to conduct an adequate investigation of the case, (c) failing to move for a judgment of acquittal on the use of a handgun charge with sufficient specificity, (d) failing to object to hearsay testimony regarding police investigations, and (e) allowing a witness to invoke his Fifth Amendment privilege in front of the jury.[6] *Id*. at Ex. 10 and 11. Following a hearing, the court issued a decision denying all relief on October 7, 2003. *Id*. at Ex. 13.

An application for leave to appeal the denial of post-conviction relief was filed on petitioner's behalf raising both the exculpatory evidence and the ineffective assistance of counsel claims. *Id*. at Ex. 14. With respect to the ineffective assistance of counsel claim, petitioner alleged that counsel failed: to object to hearsay testimony; failed to move for a judgment of acquittal on the use of a handgun charge with sufficient specificity, and failed to investigate and uncover evidence to impeach key witnesses for the State. *Id*. at p. 3. On August 20, 2004, the Court of Special Appeals issued an order requiring the State to file a response "explaining why trial counsel was not ineffective for failing to support his motion for judgment of acquittal on the charge of use of a handgun, with an argument that the State had failed to prove the weapon used qualified as a handgun." *Id*. at Ex. 15. A response was filed, and on January 11, 2005, petitioner's application

---

[6]An additional allegation regarding ineffective assistance of counsel was raised in the post-conviction petition but was withdrawn at the hearing. Paper No. 6 at Ex. 12, p. 5. Petitioner had alleged that counsel was ineffective for failing to demand a hearing on the use of his prior conviction for manslaughter for impeachment purposes in the event petitioner had taken the stand in his own defense.

for leave to appeal was summarily denied. *Id*. at Exs. 16 and 17.

## Threshold Considerations

### *Exhaustion of State Remedies*

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, he must have exhausted each claim presented to the federal court by pursuing remedies available in state court. This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(b) and (c). In Maryland, this may is accomplished by proceeding with certain claims on direct appeal (and thereafter seeking *certiorari* to the Court of Appeals), and with other claims by way of a post-conviction petition, followed by seeking leave to appeal in the Court of Special Appeals.

Petitioner no longer has any state direct appeal or collateral review remedies available to him with respect to the claims raised in this court; thus, his claims are considered exhausted for the purpose of federal habeas corpus review.

### *Statute of Limitations*

Respondent does not contend -- and this court does not find -- that the petition is time-barred pursuant to 28 U.S.C. §2244(d).

## Standard of Review

Because the petition was filed after April 24, 1996, it must be evaluated pursuant to amendments to the habeas corpus statutes contained in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified in scattered sections of 28 U.S.C.).[7] Under the AEDPA, federal courts exercise a limited review. Under the amendments,

---

[7] *See Brown v. Angelone*, 150 F.3d 370 (4th Cir. 1998).

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2) (as amended). In reviewing petitioner's attack on his state court conviction, the court presumes that the state court's factual determinations are correct. Petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor observed that:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id*. at 412-13. The Court noted that "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the *dicta*, of th[e] Court's decisions as of the time of the relevant state-court decision." *Id*. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. With these standards in mind, this court addresses the claims now before it.

Analysis

The petition raises two grounds for relief. First, petitioner alleges that trial counsel was ineffective for failing to object to the two-part voir dire question posed to the jurors by the court. Paper No. 1 at pp. 2-4. Second, petitioner alleges that the State failed to turn over exculpatory evidence in the form of a police report indicating that the victim was unable to identify his assailant immediately after the shooting. in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at 4-6.

Respondent asserts that petitioner's claim regarding the voir dire questions is procedurally defaulted because it was not raised in his application for leave to appeal the post-conviction court's decision denying relief on this claim. Paper No. 6 at p. 13. Alternatively, respondent claims that the post-conviction court's finding that counsel's performance was not deficient in this regard was not an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at p. 15. With respect to petitioner's claim under *Brady,* respondent asserts that this court should not disturb the post-conviction court's conclusion that the result of the proceeding would not have differed had the evidence in question been available to the defense. *Id.* at p. 22.

*Ineffective Assistance of Counsel Claim*

Petitioner asserts that his claim regarding ineffective assistance of counsel should not be dismissed as procedurally defaulted because it was raised on direct appeal as well as in the post-conviction proceedings. Petitioner claims that the issue was not included in the application for leave to appeal the post-conviction decision because his attorney thought it would be futile.

The procedural default doctrine applies where a state court refuses to consider the merits of a claim on procedural grounds or where procedural grounds would clearly bar consideration of the claim by a state court. *See Teague v. Lane*, 489 U. S. 288, 297-98 (1989). It does not apply if a state court fails to apply the bar and considers the merits of a claim. *See County Court of Ulster v. Alton*,

9

442 U. S. 140, 154 (1979). A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir.1999). Maryland's requirement that certain claims be presented on direct appeal, *see* Md. Ann. Code Art. 27, §645A(c), constitutes an adequate and independent state procedural rule. *See Johnson v. Smith*, 981 F. Supp. 944, 948 (D. Md. 1997).

The claim at issue in this case is the ineffectiveness of counsel in failing to object to the two-part voir dire questions. Such a claim is not typically considered by Maryland's appellate courts on direct appeal, but instead is considered during the post-conviction process. The claim was not included in petitioner's application for leave to appeal the post-conviction court's decision and, accordingly, could not be addressed by the Court of Special Appeals. Accordingly, petitioner's claim of ineffective assistance of counsel is procedurally defaulted and this court will not reach the merits of the claim.

*Brady Claim*

There is no dispute that a police report memorializing an attempt to interview the victim within hours of the shooting was not provided to the defense prior to trial. The report noted that the officer "attempted to interview the victim at 0303 hours, but the victim could not answer any questions. The victim did state that he did not see the suspect, but then stated that the suspect was black." The report was not discovered until post-conviction counsel made a request under Maryland's Freedom of Information Act.

The defense in this case was that defendant was misidentified as the assailant. During post-conviction proceedings, petitioner asserted that had the police report been available to his attorney at trial, the victim's in-court identification, which was heavily emphasized by the State, would have been impeached.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady*, 373 U.S. at 87. "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985). To prevail on a *Brady* claim, it must be established that the evidence at issue is both favorable to the defense and that the unavailability of the evidence calls into question the result of the trial. *Id*. at 678. The Supreme Court has made it clear that there is no distinction between exculpatory evidence and impeachment evidence in the context of a *Brady* analysis. *See Giglio v. United States*, 405 U.S. 150, 154 (1972).

In considering the merits of the *Brady* claim, the post-conviction court observed that "the case against [petitioner] was not a close one." The victim was the central witness for the State and his in-court identification was strong evidence. The victim also identified petitioner in a photo array prior to trial. In addition another witness, Malkia Waters, identified petitioner as the shooter. In her testimony she stated, "I saw the guy that got shot. He was laying on the ground, and I saw the Defendant standing over him shooting until the gun jammed." *Id*. at Ex. 3, p. 118. In addition to Waters's testimony, another witness for the State, Toma Johnson, described the clothing worn by the shooter which matched the description given by the victim and Waters. *Id*. at 92-94.

The post-conviction court noted that defense counsel's cross-examination of the victim attempted to impeach his credibility and the missing police report would have made the cross-examination more effective. The court noted, however, that the content of the report made its rebuttal value minimal. The report notes that the attempt to interview the victim occurred one hour after the shooting, when the victim was in critical condition suffering from a gunshot wound to the chest. In addition, it is noted that "the victim could not answer any questions" and stated that he did

11

not see the assailant, who was a black male. Compared with the strength and probity of the victim's out-of-court and in-court identifications, the report's impact (given the context out of which the events occurred) is largely insignificant. As noted by the State in closing argument, the victim stated he was certain that petitioner was the shooter because "we were eye to eye", and he had no motive to lie about the identity of his assailant. The testimony of Detective Watkins regarding the victim's identification of petitioner from a photo array indicated no uncertainty in the victim's ability to identify the man who shot him.

In closing argument defense counsel pointed out that the victim was under the influence of alcohol on the night of the incident and questioned the reliability of his testimony. Counsel also pointed out that the victim's testimony that he had walked out of the club with Johnson was contradicted by Johnson, providing an additional reason to doubt the accuracy of his account. That attempt to impeach the victim's account of events was rebutted by the prosecution when it was again emphasized that the victim had no reason to lie and that his identification of petitioner was consistent with the two other witnesses who had testified.

The post-conviction court's conclusion that "the value of the undisclosed police report is not significant given Mr. Jackson's medical condition at the time the statement was given, the inherent inconsistencies within the report itself, the other identifying witnesses, and the identification by Mr. Jackson after he was stabilized and at trial" is not an unreasonable application of well-established law. Accordingly, this court finds that petitioner has not presented sufficient grounds for federal habeas relief and the petition shall be denied.

Filed: April 20, 2006                                          _____/s/_____
                                                               Andre M. Davis
                                                               United States District Judge